Hobart Ledgerwood,

     Plaintiff,

vs                                     Case No: 06-13605
                                          Honorable Victoria A. Roberts

National Amusements, Inc.,

     Defendant.

_____/

## OPINION AND ORDER

### I.    INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment.

For the reasons stated below, the Court **GRANTS** Defendant's motion.

### II.    BACKGROUND

Plaintiff Hobart Ledgerwood brings this action against his former employer,

Defendant National Amusements, Inc.  National Amusements operates movie theaters,

most often known as the Showcase Cinemas, in twelve states including Michigan.

Plaintiff began working for Defendant in 1982.  In January 2005, he was fired from his

position as Managing Director of the Beacon East theater in Harper Woods, Michigan.

Defendant says Plaintiff was fired because he allowed a third party to take company

property.  Plaintiff contends that his age (49) was a factor in Defendant's decision and

that he was promised that he would only be terminated for cause.

Plaintiff was promoted to Managing Director approximately six months before he

was fired.  Shortly after his promotion, Plaintiff asked his District Manager, Rusty Belcher, for permission to remove aluminum acoustic panels ("ALPRO") from one of Defendant's closed theaters in Sterling Heights, Michigan.  Without consulting Defendant's home office, Belcher gave his approval.  Over the next month, Plaintiff and another employee at Beacon East, Dan Nasiatka, removed nearly all of the ALPRO from the theater.  Nasiatka was the House Manager at Beacon East and he was responsible for monitoring the closed Sterling Heights facility.  Plaintiff was Nasiatka's supervisor at Beacon East.  Plaintiff and Nasiatka sold the ALPRO for scrap; they each received $2,000.

While removing the ALPRO, Plaintiff enlisted the help of Mike Monte, an independent electrical contractor who has done work for Defendant.  Plaintiff asked to borrow Monte's scaffolding to remove the ALPRO from certain areas.  Monte agreed and asked Plaintiff if he could remove "masking motors," which are used to operate the curtains in front of the movie screen.  Monte says he intended to use them for spare parts for Defendant and his other theater customers.  Without getting authorization from Belcher or any other superior, Plaintiff gave Monte permission after he confirmed with Nasiatka that the motors were still there.  He advised Nasiatka that he intended to allow Monte to take them.

Per Defendant, Monte removed 15 motors valued at $17,000.  Although Plaintiff says he believed the motors were going to be discarded, he acknowledged that Defendant often used masking motors from closed facilities at its other locations or for spare parts.  Plaintiff also acknowledged that he needed permission from either Belcher or the home office to remove property from the theater, and that Belcher said that

nothing was to leave the building without his approval.  Def. Exh. D at pp. 106-107.

In January 2005, Defendant's Assistant Vice President of Operations, Steve Horton, learned about the ALPRO removal.  Horton questioned Belcher, who admitted that he gave Plaintiff and Nasiatka permission.  Horton says Belcher initially claimed that Dan and Nasiatka removed the ALPRO for use in projects in their homes.  Shortly thereafter, however, Horton says Belcher told him that it was actually sold for scrap. Def. Exh. A at p. 26.  Horton immediately hired an independent investigation firm to interview Belcher, Plaintiff, Nasiatka and others.

After he talked to Horton, Belcher met with Plaintiff and Nasiatka on a Friday to discuss the ALPRO and find out how much was removed.  Belcher advised them about the investigation and that they would be questioned the following Monday.  When Belcher asked Plaintiff and Nasiatka if they took anything else, they said no.  Def. Exh. D at p. 111.  Plaintiff says they simply forgot about the motors until later that evening. Plaintiff then called Monte and asked to him to return the motors.  Plaintiff picked them up from Monte on Sunday and returned them to the theater.  Plaintiff advised the investigator about the motors during his Monday interview.  Afterwards, he also advised Belcher.

One week later, Horton interviewed Plaintiff and Nasiatka.  Horton says Plaintiff admitted that he did not get permission for removal of the motors.  At the end of the interview, Horton fired Plaintiff for removing the motors and failing to disclose his conduct when questioned by Belcher.

Nasiatka, who was 35 years old at the time, was not terminated, but he was demoted to Manager and his pay was reduced by $25 per week for one year.  Horton

said that he did not learn that Nasiatka knew that Plaintiff was going to allow the motors to be removed until after this litigation was underway, because Plaintiff did not indicate as much during their interview.  Also, in the investigative firm's summary of the interview with Plaintiff, the interviewer reported that Plaintiff said he gave the motors to Monte without consulting with any other employee, and Plaintiff made no mention of Nasiatka's involvement in his written statement.  Nasiatka also did not volunteer information about his involvement during any of his interviews.  Horton said he did not ask Nasiatka about the motors because Plaintiff never mentioned that anyone else was aware.

Belcher was disciplined, but not fired.  His authority has been restricted and he must comply with additional reporting requirements.  Belcher is three years younger than Plaintiff.  All of the disciplinary actions were approved by Senior Vice President Bill Towey, who is twenty years older than Plaintiff.

Plaintiff asserts two state law claims: age discrimination and wrongful discharge breach of contract.  Defendants requests summary judgment on both claims.

## III.    STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).  A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and

obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV. ARGUMENT AND ANALYSIS

## A.    Wrongful Discharge Breach of Contract

Plaintiff did not have a written employment contract or other written agreement setting forth the length or conditions of his employment.  But, he argues that his termination constituted breach of contract because he either was promised or had a reasonable expectation that he could only be fired for cause.  Defendant denies that any such promise was explicitly or implicitly conveyed to Plaintiff.  Per Defendant,  Plaintiff was an at-will employee.

Under Michigan law, employment contracts for an indefinite term are presumed to be terminable at the will of either party.  *Lytle v Malady*, 458 Mich. 153, 163 (1998).  However, "[t]he presumption of employment at will is overcome with proof of either a contract provision for a definite term of employment, or one that forbids discharge absent just cause."  *Id* at 164.  "Courts have recognized the following three ways by which a plaintiff can prove such contractual terms: (1) proof of 'a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause;' (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a 'legitimate expectation' of job security in the employee."  *Id* (footnotes omitted).  Plaintiff attempts to establish his claim via the second and third methods of proof.

### i.    Legitimate Expectations

Michigan employs a two-step analysis to evaluate legitimate expectations claims. "The first step is to decide 'what, if anything, the employer has promised, and the

second requires a determination of whether that promise is 'reasonably capable of instilling a legitimate expectation of just-cause employment....'" *Lytle*, 458 Mich. at 164-165 (*quoting Rood v General Dynamics Corp.*, 444 Mich. 107, 138-139 (1993)).

Although not clearly alleged in his Complaint, Plaintiff argues that he had a legitimate expectation of just cause employment because of three statements management personnel allegedly made to him during his tenure. Plaintiff was initially hired as a temporary summer worker. Def. Exh. D at p. 146. Either 90 days or 6 months after he was hired,[1] Plaintiff says he asked District Manager Bob Schwick whether he was considered a full-time or permanent employee. In response, Schwick allegedly said "we'll always have a job for you as long as you keep working, doing a good job." *Id* at 147. Over ten years later, in 1993 or 1994 when he was promoted to House Manager, Plaintiff says District Manager Brad Wick expressed the same sentiment--"Just come in, do your job, keep doing a good job . . . and the promotions will come and we'll always take care of you." *Id* at 148. Lastly, when Defendant's Sterling Heights theater closed, Plaintiff says Wick's successor, Rusty Belcher, advised him and others that "the managing directors and house managers were exempt from layoffs because of the theater closings." *Id* at 150.

Plaintiff asserts that these statements are buttressed by the testimony of another employee, Gary Trepanier, during a deposition in an unrelated state court case. Trepanier testified that when he was hired as a Manager, Schwick told him that "[t]he only people that ever get fired from [Defendant's] company were . . . 'blatant thieves.'"

---

[1]Plaintiff was uncertain of the exact date.

Pl. Exh. F. at p. 140.  Also, Plaintiff says Wick and other employees routinely referred to him as a "lifer."

Plaintiff's allegations are insufficient to establish that he had a legitimate expectation of just cause employment.  First, the Court finds that the alleged statement by Belcher does not support Plaintiff's claim because Plaintiff admits that Belcher only indicated that managers were exempt from theater closing layoffs; it was not a general statement of exemption under other circumstances.

There also is no support for Plaintiff's claim that Wick referred to him as a "lifer." Plaintiff actually testified that it was only other managers who referred to him in that manner:

> Q:     Okay.  I just want to switch gears a little bit now and go to the statements made to you by Bob [Schwick] and Brad [Wick] about you just do a good job, your going to have a job here, et cetera.  Did you rely on those statements to make you believe that you would have continued employment with National Amusement?
>                                                 \* \* \*
> A:     We joked about my length of service all the time at the theater and I was considered a lifer and I had thought that I would retire from National Amusements, yes.
>                                                 \* \* \*
> Q:     You testified in response to a question by your attorney that, I was considered a lifer.  Who considered you that?
>
> A:     Some of the other managers.
>                                                 \* \* \*
> Q:     [T]hese are people at your level or lower?
>
> A:     Yes.

Def. Exh. D at pp. 200, 202.  Dan Nasiatka testified that "lifer" was a term Wick used, but he was unable to say whether Wick used the phrase with respect to Plaintiff:

Q:      Did you ever hear a district manager or someone from the home office refer to Dan Ledgerwood as a lifer?

A:      Yes, probably someone from the district office.

Q:      What do you mean, someone like a secretary or something?

A:      No, like Brad Wick.

Q:      Do you know or are you guessing?

A:      I don't know.  Lifer is a Brad Wick term.

* * *

Q:      [Y]ou don't know whether or not [Wick] called Dan Ledgerwood a lifer?

A:      I can't say for sure, no.

Pl. Exh. A at p. 85, 88.

The remaining statements by Schwick and Wick which Plaintiff relies upon do not reasonably instill a legitimate expectation of just cause employment because there is no evidence the alleged promises were made to anyone other than him.  In *Rood v General Dynamics Corp.,* 444 Mich. 107, 138 (1993), the Court stated that an employee may only base a legitimate expectations claim on policies that are "disseminated either 'to the work force in general or to specific classifications of the work force, rather than to an individual employee.'" (*quoting Bankey v Storer Broadcasting Co.,* 432 Mich. 438, 443 n.3 (1989)).  "The legitimate expectations exception is therefore inappropriate where desirable policies and procedures are applicable only to an individual employee." *Id* at 138 n.31.  *See also Novak v Nationwide Mutual Insurance Company*, 235 Mich. App. 675, 682-683 (1999)("[A] claim based on legitimate expectations rests on the employer's promises to the work force in general--for example, promises contained in a

9

company handbook--rather than on promises made to an individual employee.").

There is no evidence the alleged promises by Schwick and Wick extended to the general workforce. Plaintiff only asserts that they were made during his conversations with Schwick and Wick about his future with the company.

Trepanier's testimony does not advance Plaintiff's claim. Trepanier testified that Schwick told him that he could only be fired for theft. But, Trepanier hired in as a Manager and he said the alleged assertion was made during a discussion about the circumstances under which he (Trepanier) could be fired. Plaintiff, however, held a different position and the statement Schwick allegedly made to him was in response to his inquiry about whether his status as a temporary employee had changed to "full-time" or "permanent." Trepanier's testimony is insufficient to show that Defendant announced a broad policy of just cause employment to the general workforce which Plaintiff relied upon.

### ii. Oral Contract

Plaintiff asserts that Schwick's comment shortly after he was hired was an assurance of "permanent employment" which is sufficient to establish a wrongful discharge claim.[2] In support, he cites *Ritchie v Michigan Consolidated Gas Co.*, 163 Mich. App. 358 (1987) and *Rice v ISI Manufacturing, Inc.,* 207 Mich. App. 634 (1994).

---

[2]In his brief, Plaintiff actually attributed the statement to Wick, which is contrary to his deposition testimony. Pl. br. at p. 11. In his deposition, Plaintiff said Wick did not promise him continued employment until approximately 10 years after he began working for Defendant.

Plaintiff also cites Wick's alleged repeated reference to him as "lifer" in support of his claim. However, for the reasons stated, there is no evidence that Wick, in fact, made any such reference to Plaintiff.

"[O]ral statements of job security must be clear and unequivocal to overcome the presumption of employment at will." *Rowe v Montgomery Ward & Co., Inc.,* 437 Mich. 627, 644 (1991). A plaintiff must show that there was a mutual assent to a just cause contract. *Rood*, 444 Mich. at 119. To determine whether there was mutual assent, courts apply an objective test which focuses on the "expressed words of the parties and their visible acts." *Id* (citations omitted). "The starting point in analyzing oral statements for contractual implications is to determine the meaning that reasonable persons might have attached to the language, given the circumstances presented." *Rowe*, 437 Mich. at 640.

The Michigan Supreme Court declined to find an oral contract based on assurances similar to those Plaintiff claims were made, absent other objective evidence suggesting mutual assent. In *Rowe v Montgomery Ward & Co., Inc., supra*, plaintiff alleged that she was advised during her job interview that she would have a job at Montgomery Ward as long as she achieved her sales quota. Quoting this Court with favor, the *Rowe* Court noted that there is a distinction between mutual assent and mere expressions of an "optimistic hope of a long relationship," the latter being insufficient to establish a just cause contract:

> *Lynas* [*v Maxwell Farms*, 279 Mich. 684 (1937)] as well as reality compels recognition of the fact that neither party to the beginning of an employment relationship expects it to be unsatisfactory, and both hope it will have a significant duration. This hope and noncontractual wish is expressed in terms of language such as "as long as you do the job."

437 Mich. at 640 (*quoting Carpenter v American Excelsior Co.,* 650 F.Supp. 933, 936 n.6 (E.D. Mich. 1987)).

The *Rowe* Court held that neither the circumstances nor other objective evidence reasonably supported plaintiff's interpretation of the statement she relied upon as mutual assent to permanent employment; it merely represented an "optimistic hope of a long relationship." The Court reached this conclusion by comparing Rowe to the plaintiffs in Michigan's seminal wrongful discharge case, *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich. 479 (1980).

The *Toussaint* plaintiffs alleged that they were told when hired that they would be with the company as long as they did the job. *Toussaint* stated that a fair construction of such a statement is that "the employer has agreed to give up his right to discharge at will without assigning cause and may discharge only for cause (good or just cause)." 408 Mich. at 610. However, *Rowe* noted that, in fact, the *Toussaint* Plaintiffs did not rely solely upon the alleged statement; they had specifically negotiated job security, they were applying for unique executive positions, and one of the plaintiffs was given a manual which stated that he could only be fired for cause. Rowe, however, could make no such claims. She did not engage in pre-employment negotiations regarding security, the position for which she applied was not unique, and the only writing she received listed numerous ways in which she could be discharged, contrary to the interviewer's assertion that she would be employed as long as she met her quota.

Similarly, citing *Rowe* and distinguishing *Toussaint*, the Michigan Supreme Court in *Rood v General Dynamics Corp., supra*, held that an employer's assurance that "unless something was really wrong" plaintiff would "be there for retirement" did not demonstrate mutual assent, even though the statement was made in response to plaintiff's inquiries about job security. 444 Mich. at 122-123. The Court found the

12

circumstances distinguishable from *Toussaint* because the statements the *Toussaint* plaintiff relied upon were made during discussions about the likelihood he would be fired. In *Rood*, however, plaintiff was concerned about losing his job if the employer ceased its operations in the department to which plaintiff was being transferred, not the conditions under which he could be fired. Given the narrow scope of the *Rood* plaintiff's inquiry, the Court held that there was no basis to find mutual assent to a just cause contract.

Since *Rowe*, the Michigan Court of Appeals has consistently declined to find just cause employment based solely on obscure statements. For instance, in *Lytle v Malady, supra*, the Court held that the employer's assurance that plaintiff's job was secure and that she had potential for promotion, were merely expressions of optimistic hope, because there was no discussion about duration of employment and no evidence of negotiations or an intent to enter a just cause contract.

The Michigan Court of Appeals reached the same conclusion in *Brewer v Hill*, 2000 W.L. 33407016 (2000), an unpublished opinion, where there was no evidence plaintiff and his employer negotiated job security. When plaintiff asked about his wages, the employer responded that Plaintiff would have a job for as long as he wanted as long as he did not do anything "grossly wrong." The Court held that this exchange did not constitute negotiation and was insufficient to establish assent to just cause employment. The Court further stated that "the fact that [an employee] may have raised the issue of job security does not, standing alone or even when combined with . . . other circumstances, constitute 'negotiations.'" 2000 W.L. 33407016 at *2 (*quoting Bracco v Michigan Technological University*, 231 Mich. App. 578, 602 (1998)).

Like the plaintiff in *Rowe* and its progeny, Plaintiff Ledgerwood failed to present objective evidence on which reasonable jurors could base a finding that Schwick's alleged statement constituted mutual assent to a just cause employment contract. There is no evidence Schwick's statement was made in the course of negotiations with Plaintiff. Plaintiff acknowledged in his deposition that the position for which he was hired was not unique. And, Plaintiff was not given any documents which suggested just cause employment.

Also, Plaintiff said the statement was prompted by his inquiry regarding whether his status had changed from a temporary summer worker to "full time" or "permanent," not the circumstances under which he could be terminated:

> Q:   And then after 90 days, you were told not [sic] temporary?
> A:   Well, I specifically asked . . . is this temporary status up? I mean am I considered full time, permanent whatever? And I was told yes.
>
> * * *
>
> Q:   Did he tell you anything else about the terms of your employment?
> A:   No. Other than keep on doing a good job and don't worry about --
>
> Q:   Don't worry about?
> A:   You know, not being -- not working. You know, we'll always have a job for you as long as you keep working, doing a good job.

Def. Exh. D at pp. 146-147. As in *Rood*, considering the context in which Schwick's statement was made, one could not reasonably infer that he intended it as an assent to just cause employment.

Plaintiff's reliance on *Ritchie* and *Rice* is misplaced. In *Ritchie,* plaintiff alleged that she was told on four occasions that she would have a job as long as there was an

Ann Arbor office. However, the Court did not affirm the trial court's denial of defendant's motions for summary disposition and directed verdict solely because of those statements. Plaintiff had also alleged that defendant had a graduated disciplinary system, the employee handbook listed certain conduct which could result in termination, and Plaintiff's superior signed a document stating that she would be employed with the defendant for at least 20 years. In contrast, Plaintiff does not offer any evidence beyond Schwick's statement. *Ritchie* is distinguishable.

Plaintiff's reliance on *Rice* is unavailing because it is not persuasive authority. The *Rice* Court stated that it was "convinced that the evidence presented, including the supervisor's oral assurances that plaintiff could return to his engineering position if the sales position did not work out, was sufficient for the jury to find that plaintiff could not be discharged without just cause." 207 Mich. App. at 636-637. However, the Court's analysis is sparse. The Court did not identify the evidence it referenced or offer any other facts. And, the dissenting opinion points out that the majority failed to reconcile its decision with *Rood*, inasmuch as the statement the majority cites was not made in response to an inquiry about when or how he could be fired or "articulated concerns by plaintiff that he be terminated for just cause only." *Id* at 640 (dissent). The Western District of Michigan in *Noseworthy v Textron*, 1995 W.L. 681262, *5 (W.D. M.I. 1995), criticized *Rice* on the same grounds (in its assessment of a legitimate expectations claim) and declined to follow it because it is inconsistent with the precedent set by *Rood*. Likewise, this Court finds that *Rice* is not persuasive authority; the *Rice* Court failed to provide sufficient facts or analysis for meaningful comparison, and the holding appears to directly conflict with settled Michigan precedent.

15

Defendant's motion for summary judgment on Plaintiff's wrongful discharge claim is granted.

**B.     Age Discrimination**

Plaintiff contends that his termination constituted age discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. §37.2202.  The ELCRA provides that it is unlawful to "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age."

A plaintiff can establish a discrimination claim with direct or circumstantial evidence.  *Town v Michigan Bell Telephone Co.,* 455 Mich. 688, 694-695 (1997).  When the claim is based on circumstantial evidence as it is in this case, the three-step *McDonnell Douglas*[3] burden shifting approach applies.  Under this approach, a plaintiff must present a prima facie case.  *Sniecinski v Blue Cross and Blue Shield of Michigan*, 469 Mich. 124, 134 (2003).  Once the prima facie case is presented, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  "If a defendant produces such evidence, the presumption is rebutted, and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination."  *Id.*

Plaintiff's claim fails at the pretext stage.

**i.     Prima Facie Case**

"To establish a prima facie case of age discrimination, plaintiff must prove, by a

---

[3]*McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973).

preponderance of the evidence, that (1) []he was a member of the protected class; (2) []he suffered an adverse employment action; (3) []he was qualified for the position; and (4) []he was replaced by a younger person."[4]  *Lytle*, 458 Mich. at 177.  Defendant contends that Plaintiff failed to establish the third element only.

Defendant argues that Plaintiff was not qualified to continue as Managing Director because he facilitated the theft of company property.  In support, Defendant cites *Town v Michigan Bell, supra*, and an unpublished Michigan Court of Appeals decision, *Sowa, Jr. v U.S. Farathane Corp.,* 2006 W.L. 120427 (2006).  The *Town* Court stated that "[a]n employee is qualified if he was performing his job at a level that met the employer's legitimate expectations."  455 Mich. at 699.  Defendant argues that "[t]he corollary is that if plaintiff is not performing the job consistent with the employer's legitimate expectations, he is not qualified."  Def. br. at p. 16.  Defendant acknowledges that the Sixth Circuit in *Cline v Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir. 2000), held that it is not appropriate at the prima facie stage to rely upon a defendant's alleged nondiscriminatory reason to find that the plaintiff was not qualified.  But, Defendant contends that *Cline* is not persuasive authority because the Court interpreted federal law (Title VII), not Michigan law.  And, in *Sowa*, a panel of the Michigan Court of Appeals rejects *Cline* on the grounds that it is inconsistent with the standard set forth in *Town*.  Although unpublished, Defendant asserts that *Sowa* is persuasive authority

---

[4]The fourth element can vary based on the facts.  *See Hazle v Ford Motor Co.,* 464 Mich. 456, 463 n.6 (2001)("[T]he elements of the *McDonnell Douglas* prima facie case should be tailored to fit the factual situation at hand.").   Some courts indicate that a plaintiff must prove that "[]he was discharged under circumstances that give rise to an inference of unlawful discrimination."  *Debrow v Century 21 Great Lakes, Inc.,* 463 Mich. 534, 583 n.8 (2001).

because, unlike *Cline*, it interprets Michigan law.

Plaintiff argues that Defendant and the Court in *Sowa* misstate the basis of the holding in *Town* and the proofs required under Michigan law. And, he contends that the fact that he met Defendant's legitimate expectations is evidenced by his overwhelmingly positive performance evaluations. That is, in Plaintiff's last two performance evaluations (one completed after he was fired), he was rated as either "superior" or "outstanding" in virtually each category. Pl. Exhs. H, I.

Plaintiff is correct. Defendant reliance on *Sowa* is misplaced and there is unrefuted evidence that, notwithstanding the rule violations which were the purported basis of his dismissal, Plaintiff was otherwise performing satisfactorily.

Defendant's argument is based on a false premise; namely that *Town* "used the reason for [plaintiff's] termination (inadequate sales revenue) to defeat the qualification element of the *prima facie* case." Def. br. at p. 16. The *Sowa* Court made the same error, and further held that the *Town* standard "clearly differs from that of the Sixth Circuit." 2006 W.L. 120427 at *3.

In fact, however, the *Town* Court explicitly declined to decide whether the alleged shortcomings in the plaintiff's performance which ultimately led to his termination rendered him unqualified for purposes of the ELCRA. The Court noted that the evidence supported defendant's assertion that plaintiff's performance was "less than stellar." 455 Mich. at 699. But, the Court, nevertheless, elected to presume that plaintiff established a prima facie case and proceeded to the remaining stages of the analysis. *Id.*

Also, it is not clear how the *Sowa* Court finconcludedthat *Town* states a different

18

standard than *Cline*. In *Town*, which preceded *Cline*, the Court stated that "[a]n employee is qualified if he was performing his job at a level that met the employer's legitimate expectations." 455 Mich. at 699. In a footnote, the Court quoted with favor the holding in *Menard v First Security Services Corp.,* 848 F.2d 281, 285 (1st Cir. 1988), that "[t]o establish that he was 'qualified' a complainant must show 'that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative.'" Also, citing *Town*, the Michigan Court of Appeals in *Wilcoxon v Minnesota Mining & Manufacturing Co.,* 235 Mich. App. 347, 369 (1999), stated that "[b]eing qualified for a job, for purposes of establishing a prima facie case of discrimination, requires only minimal qualification."

Like *Wilcoxon*, the *Cline* Court set forth settled law that a plaintiff's burden at the prima facie stage is easily met. And, with respect to the qualification element, *Cline* held (like *Town*) that a court must determine whether a plaintiff met his employer's *legitimate expectations*. 206 F.3d at 660-661. The *Sowa* Court regarded *Cline's* further holding that – "a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff" – as a deviation from *Town*. However, the *Sowa* Court's ruling appears to be based in large part on the incorrect assumption that the *Town* Court allowed defendant to rely upon its nondiscriminatory reason to defeat plaintiff's prima facie claim. Further, *Sowa* does not reconcile its holding with *Town*'s implicit adoption of the language in *Menard*–that an employee only needs to show that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance. *Cline* employs the same principle.

19

Finally, although *Cline* did not interpret Michigan law, the Sixth Circuit, citing *Town* and *Cline,* applied the same analysis to an ELCRA age discrimination claim in *Cicero v Borg-Warner*, 280 F.3d 579, 585 (6th Cir. 2002).  Defendant does not cite any published Michigan decisions which either repudiates or is inconsistent with *Cline* and *Cicero.*

For these reasons, and because Plaintiff presents unrefuted evidence that he was performing satisfactorily prior to the events Defendant cites as the reason for his termination, the Court finds that Plaintiff established that he was qualified for his position within the meaning of the ELCRA.  Therefore, Plaintiff met his burden at the prima facie stage.

### ii.    Legitimate, Nondiscriminatory Reason

Since Plaintiff established a prima facie claim, the burden shifts to Defendant to rebut the presumption that it engaged in age discrimination.  Defendant met this burden by presenting evidence that Plaintiff was fired for allowing Monte to remove Defendant's property without authorization.  *See Sisson v University of Michigan*, 174 Mich. App. 742, 748 (1989)(alleged theft of university property is a legitimate, nondiscriminatory reason for discharge).  The burden, therefore, shifts back to Plaintiff to prove that Defendant's proffered reason is merely a pretext for discrimination.

### iii.    Pretext

"A plaintiff can establish that a defendant's articulated legitimate, nondiscriminatory reasons are pretexts (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors

motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Feick v County of Monroe*, 229 Mich. App. 335, 343 (1998). It is not enough for a plaintiff to simply disprove the employer's purported nondiscriminatory reasons; plaintiff must present evidence that age was a motivating factor in defendant's decision:

> [D]isproof of an employer's articulated reason for an adverse employment decision defeats summary disposition only if such disproof also raises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action. In other words, plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for age or sex discrimination.

*Lytle*, 458 Mich. at 175-176. *See also Town*, 455 Mich. at 697.

Plaintiff attempts to establish pretext by the third means--that Defendant's purported reason was insufficient to justify firing him. Proof by this means "ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer v Diamond Shamrock Chems Company,* 29 F.3d 1078, 1084 (6th Cir. 1994). An inference of disparate treatment will only arise, however, if the employee with whom Plaintiff compares himself is similarly situated, meaning that "all of the relevant aspects" of Plaintiff and the other employee's employment situation were "nearly identical." *Town*, 455 Mich. at 700.

Plaintiff alleges that the fact that neither Belcher nor Nasiatka were fired despite similar conduct by both before and after Plaintiff was fired, shows that Defendant's

claimed reason was pretext.  Specifically, Plaintiff points out that Nasiatka was not fired although he was in charge of the Sterling Heights theater when the masking motors were removed, and he was aware of Plaintiff's intentions but did not intervene or report it to his superiors.   Nasiatka also has not been fired even though Defendant learned during this litigation that he took mirrored ceiling tiles from the Sterling Heights theater and gave them to a friend.

Neither circumstance establishes that Nasiatka was treated more favorably. Nasiatka was not fired or disciplined for his acquiescence in Monte's removal of the motor.  But, there is no evidence that Defendant was aware of Nasiatka's involvement. Plaintiff acknowledges that he did not mention that Nasiatka was aware of what Plaintiff did during any of his investigatory interviews, and Nasiatka did not come forward. Horton said that he did not question Nasiatka about the motors because Plaintiff never indicated that anyone else was involved.

Nasiatka also has not been fired although Plaintiff revealed during his deposition (in January 2007) that Nasiatka removed mirrored ceiling tiles from the Sterling Heights theater without permission and gave them to a friend.  Nasiatka testified that a portion of the ceiling in the theater collapsed from water damage.  Nasiatka took three or four broken tiles from a pile of debris and gave them to an artist friend.  Plaintiff asserts that, by Defendant's definition, this constitutes theft which in his (Plaintiff's) case was punishable by termination.  Plaintiff's argument is unavailing.

Where a plaintiff claims that he was disciplined more harshly than another employee outside his protected class, the plaintiff must establish that the other employee's acts were of "comparable seriousness" to his own infraction.  *Warfield v*

22

*Lebanon Correctional Institution*, 181 F.3d 723, 730 (6th Cir. 1999).   Here, Nasiatka

removed a few broken tiles from a pile of debris and admitted it when questioned.   In

contrast, Plaintiff allowed Monte to remove operable fixtures valued at $17,000 from

Defendant's theater without permission and with knowledge that Defendant sometimes

harvested masking motors for its own use.   Plaintiff also failed to disclose what he had

done when Belcher asked or as soon as he remembered.[5]   There is no basis to find that

Nasiatka's act was comparably serious to Plaintiff's.

Plaintiff next points out that Belcher was not fired although he initially lied to

Horton about the reason he gave Plaintiff and Nasiatka permission to remove ALPRO

from the theater.   Belcher said he believed they were only going to remove a small

portion for use in their homes.   But, neither Nasiatka nor Plaintiff ever made any such

representation.   Belcher also was not fired although Defendant learned during its

investigation of the Sterling Heights matter that Belcher routinely took the company van

for personal use without prior authorization.

Defendant's failure to discharge Belcher does not support Plaintiff's claim of

pretext.   Plaintiff and Belcher are not similarly situated inasmuch as Belcher is a District

Manager and Plaintiff was only a Managing Director and Belcher's subordinate.   Neither

Belcher's dishonesty about the reason that he authorized removal of the ALPRO nor his

_____

[5]Plaintiff asserts that there is no evidence Belcher ever "directly questioned" him about the masking motors.  Therefore, he contends that it is inaccurate for Defendant to assert that he failed to reveal information about them when questioned by Belcher. There is no merit to this argument.  There is no evidence that Belcher had any reason to inquire about the masking motors before Plaintiff confessed.  But, when Belcher advised Plaintiff of the pending investigation into the ALPRO and asked if he or Nasiatka took anything else, Plaintiff admits that he and Nasiatka said "no."  Def. Exh. D at pp. 110-111.

improper use of Defendant's van could reasonably be deemed comparably serious to Plaintiff's infraction. And, an inference of discrimination is further undercut by the fact that Belcher was 46 when Plaintiff was fired; he was only three years younger than Plaintiff and within the same protected class. *See Lytle*, 458 Mich. at 180 (fact that three of the employees to whom plaintiff's duties were reassigned were only two years younger and within same protected class listed among factors which defeated plaintiff's claim of pretext).

Defendant's motion for summary judgment on Plaintiff's age discrimination claim is granted.

## V.  CONCLUSION

Defendant's Motion for Summary Judgment is **GRANTED** in its entirety.

**IT IS ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  August 17, 2007

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on August 17, 2007.

s/Linda Vertriest
Deputy Clerk